1

```
 1                    UNITED STATES DISTRICT COURT.
                      EASTERN DISTRICT OF NEW YORK
 2

 3     ---------------------------------X
       UNITED STATES OF AMERICA,
 4                                       :    CR-13-351
                                              (SJF)
 5            -against-                  :    United States Courthouse
                                              Central Islip, New York
 6     BUSHRA BAIG and FARRUKH BAIG,
                                         :    April 27, 2015
 7                   Defendants.              11:15 a.m.
       ---------------------------------X
 8
                         TRANSCRIPT OF SENTENCING
 9                 BEFORE THE HONORABLE SANDRA J. FEUERSTEIN
                      UNITED STATES DISTRICT COURT JUDGE
10

11     APPEARANCES:

12     For the Government:         LORETTA E. LYNCH, ESQ.
                                   UNITED STATES ATTORNEY
13                                    BY: CHRISTOPHER OTT, AUSA
                                   One Pierrepont Plaza
14                                 Brooklyn, New York 11201

15

16     For the Defendants:         JOSEPH CONWAY, ESQ.
                                   For F. Baig
17
                                   DOUGLAS BURNS, ESQ.
18                                 For B. Baig

19

20

21

22     Official Court Reporter:    Paul J. Lombardi, RMR, FCRR
       Ph. (631) 712-6106          100 Federal Plaza - Suite 1180
23     Fax (631) 712-6122          Central Islip, New York 11722

24
         Proceedings recorded by mechanical stenography.
25                  Transcript produced by CAT.
```

1                THE CLERK:  USA v Farrukh Baig and Bushra Baig.
2                Please state your appearances for the record.
3                MR. OTT:  Good morning, your Honor, Christopher
4    Ott for the United States.
5                MR. CONWAY:  Good morning, your Honor, Joe
6    Conway for Farrukh Baig.
7                MR. BURNS:  And Doug Burns for Bushra Baig.
8                THE COURT:  Before we begin with the formal
9    sentencing I would like to speak with counsel at the
10   sidebar and before we do that I would like you each, if
11   you are willing to do so, to waive your clients'
12   appearance at the sidebar.
13               MR. CONWAY:  I'm willing to do that, your Honor.
14               MR. BURNS:  Willing to do that, your Honor.
15               (Discussion held off the record.)
16
17               THE COURT:  We'll begin with Mr. Burns' client.
18               MR. BURNS:  Yes, your Honor.
19               THE COURT:  Any objections to the presentence
20   report?
21               MR. BURNS:  No, your Honor.
22               THE COURT:  Does the government have any
23   objections to the presentence report?
24               MR. OTT:  No, your Honor.
25               THE COURT:  That being said, Mr. Burns, is there

1  anything you wish to say on behalf of your client prior to
2  the imposition of sentence?
3          MR. BURNS:  Yes, just very briefly, your Honor.
4  I know that the court does not like counsel to repeat the
5  letters that they filed, so I'm not going to do that.
6          THE COURT:  If you want to, you may.
7          MR. BURNS:  I'm going to take a modified
8  approach and highlight a couple of points I think bear
9  repetition.
10         My client served three and a half months in
11 custody.  She was on vigorous home detention with
12 electronic monitoring for a year.  It was October 4th of
13 2013 until 5th of 2015.  I also put in the letter she
14 engaged in some cooperation efforts.  I accept that the
15 government did not file a 5K1 motion, but, at the same
16 time, particularly after the **Booker** decision your Honor
17 can take that into account.
18         Lastly, a couple other points, one is the issue
19 with her children, we greatly appreciated the probation
20 department pointing out in the report she has primary
21 responsibility for her son and her daughter and we ask you
22 to take that into account and I would ask you to give her
23 time served in light of the fact she served the three and
24 a half months.
25         THE COURT:  There is another mention within the

4

1  probation report that in point of fact, tell me if it is
2  still a fact, that these defendants have not taken any
3  steps to provide alternative child care.
4              MR. BURNS:  Right.
5              THE COURT:  Why is that?
6              MR. BURNS:  Well, I'm not really sure.
7              It just said that a couple of the relatives live
8  a distance away was one point, up in the Rochester area,
9  so I think that was part of it, quite honestly.
10             THE COURT:  Probation did make a note of the
11 fact that should they both be incarcerated there would be
12 no one to care for the children.
13             You are asking for time served.  The government
14 has written a letter and they have asked me to utilize
15 their request for a sentence within the range of ten
16 months to 16 months, and you are saying she served a year
17 under house detention.
18             MR. BURNS:  And three and a half months in
19 actual custody.
20             THE COURT:  Yes.
21             Is there anything that she wishes to say prior
22 to the imposition of sentence?
23             MR. BURNS:  Yes, just very briefly, your Honor.
24             Thank you.
25             THE COURT:  Wherever you are comfortable,

1 standing or sitting.

2     MR. BURNS: Thank you, your Honor.

3     THE COURT: Is that on?

4     THE DEFENDANT: Your Honor, this has been a very
5 long and difficult process.

6     I accept full responsibility for my actions in
7 this case, and I sincerely apologize for those actions. I
8 can assure you, your Honor, that I will never be before
9 the criminal court again. My biggest concern is my young
10 children. I'm doing everything I can to assure that they
11 can come through this in the best manner possible.

12     I ask the court to please take them into account
13 and how much they need me to guide them to take care of
14 them. I thank you, your Honor.

15     THE COURT: The sentence will be as follows:

16     Time served, and an order of restitution in the
17 sum of $2,621,114.97 due immediately with $25,000 payable
18 within 60 days from today, and thereafter payable at a
19 rate of 10 percent of your gross income per month while
20 you are on probation, five years of probation with the
21 following special conditions:

22     You shall comply with the restitution order for
23 forfeiture agreement, you shall make full financial
24 disclosure to the probation department, and you shall not
25 possess a firearm, ammunition or any type of destructive

```
 1    device.
 2              There is a $100 special assessment.  Mr. Burns,
 3    will you advise your client of her rights of appeal?
 4              MR. BURNS:  I will, your Honor.
 5              But I would note that there is a waiver in the
 6    plea agreement which covers it, thank you.
 7              THE COURT:  I know that.
 8              MR. BURNS:  Thank you.
 9              THE COURT:  It will be supervised release, not
10    probation.
11              And I am signing the preliminary order of
12    forfeiture.
13              MR. BURNS:  Thank you, your Honor.
14              THE COURT:  As to Mr. Baig, Mr. Conway, is there
15    anything that you will like to say on behalf of your
16    client?
17              MR. CONWAY:  There is, your Honor, and I'll be
18    brief.
19              Just for the record, your Honor, as the
20    presentence report goes, my client read it.  We have gone
21    over it extensively and we have no objections that pertain
22    to any of the guideline calculations.
23              THE COURT:  That's all I wanted to hear about
24    right now.
25              I read the government's letter.  I assume that's
```

1  your position on sentencing, correct?
2          MR. OTT:  It is, your Honor.
3          THE COURT:  In that letter, the government asks
4  that I follow the presentence report's guideline range,
5  which is 70 to 87 months, correct?
6          MR. OTT:  That's correct, your Honor.
7          THE COURT:  Now addressing that, is there
8  anything you wish to say on behalf of your client?
9          MR. CONWAY:  Yes, your Honor.
10         Let me start by thanking the court.  I know that
11 this was the most extensive sentencing memorandum I have
12 ever submitted.
13         THE COURT:  And you are thanking me for reading
14 it?
15         MR. CONWAY:  I'm thanking you for reading it.
16         Maybe the court has seen more extensive, but by
17 far this is the most extensive I have had.  He's had a
18 tremendous amount of community support as evidenced by the
19 letters and evidenced by the people that are sitting
20 behind me today that came here for the sentencing.
21         I don't want to repeat what I said in my letter,
22 but I'm going to ask the court for five minutes to let me
23 go through four or five of the highlights, Judge.
24         THE COURT:  Go ahead.
25         MR. CONWAY:  I think where I start is with

1  Farrukh himself and his story.

2          It's somewhat the American dream come true, and
3  then becomes a disaster.  He comes to the United States in
4  the early 1980s with little more than a few dollars and a
5  dream.  He works at a variety of jobs, including that of a
6  busboy, a bellhop, a waiter and things of those nature.

7          He worked extremely hard and in 1988 was able to
8  open up his own business.  Over the course of the next 12
9  years or so, going into the early 2000s, he was able to
10 open several 7-Eleven franchises, perhaps too many because
11 once he opened that many he was not around in each store
12 and could not keep an eye on everything and being on top.
13 Not taking anything away from what he did, but I think
14 part of his problem was expanding too much.

15          THE COURT:  Are you saying he didn't know what
16 was going on?

17          MR. CONWAY:  Not at all, your Honor.

18          We are taking full responsibility, full
19 responsibility for what happened, but with anything if you
20 have one or two stores it's a little easier to manage, if
21 you have 12 or 13 you tend to be all spread out.  He knew
22 what was going on, it just made it a lot more difficult to
23 operate.

24          In that time, in the 1990s --

25          THE COURT:  Just a minute.

1                MR. CONWAY:  -- he became --

2                THE COURT:  Excuse me.

3           He knew he was doing something that was illegal.

4                MR. CONWAY:  No question about it, Judge.

5                THE COURT:  So it was more difficult to do it in

6      a lot of stores than it was in a couple?

7                MR. CONWAY:  No, Judge.

8           When you have one or two stores and you have

9      four or five or six employees it's a little more easy to

10     manage.  You have 14 stores in two or three different

11     states it makes it more difficult.  We are not saying we

12     didn't commit a crime.

13               THE COURT:  In every single one of those stores.

14               MR. CONWAY:  Absolutely, Judge.  We are not

15     hiding from that at all.

16          As I said, he became a community leader and a

17     religious leader.  You have the most letters I have ever

18     seen in a case.  Those letters come from 7-Eleven people

19     themselves, community leaders, religious leaders.  Here

20     you have somewhere about 80 or 90 letters all attesting to

21     something he's done, whether locally to them or to the

22     community that he was in.

23          There are certificates of accomplishments from

24     the White House, from MDA, multiple -- I can't pronounce

25     the second word, but it's the MDA disease, local police

1   and fire departments, chamber of commerce and a whole host
2   of local youth sports.
3              Some of the letters and I know, Judge, you have
4   read them, but here, particularly from people within
5   7-Eleven, exhibits 21 through 26, Robert Bartalomo and the
6   things he did while he was employed for 7-Eleven,
7   employees who worked with him, whether he helped with
8   weddings or health care, there was a letter in there by
9   helping somebody that needed a liver transplant and making
10  sure they got the proper medical attention, giving family
11  members jobs because they had no jobs or source of income.
12             In his religious community, the letters,
13  exhibits 29 through 36, calling him a leader and somebody
14  always willing to help, paying for funerals of people in
15  the community and helped building the church that they
16  prayed in.
17             And, most importantly, your Honor, the letters
18  from the family.  His daughter, his son, I was struck by
19  his son's letter at 15, 16 year old individual wrote a
20  letter that I thought was much more mature than his age,
21  and then a letter from his aunt which explains how Farrukh
22  at a young age took it upon himself to start collecting
23  money from a family that lost everything they had in a
24  fire to help that family.
25             Those type of letters that I think illustrate

the good side of Farrukh.  The letter from his nephew Mahamed Baig who not only talked about him going to a soccer game, but helping him start a business and when his partner got cancer and unfortunately died from cancer how Farrukh was there to help them out.

That, in itself, Judge, I think warrants -- I respectfully submit warrants a deduction, but there's a couple other areas I want to add on to that, his health.  He looks as a relatively healthy young man at 59.  I'm going to call that young because I'm very close to that age.

THE COURT:  I agree it's young.

MR. CONWAY:  We agree on that, Judge.

While he looks healthy, he does have a family history, his father died at 58, other familiar members have died at a similarly young age.  As the letters indicate he went through some heart procedures.  He has a couple of -- I don't know if the correct word is shunts or stents -- but he has a couple in his heart.  He suffers from hypertension and type two diabetes, while they are all treatable, the family history and a strain of a long prison sentence makes his history something that I hope the court takes into consideration.

Additionally, your Honor, I want to talk about his actions since his arrest.  He's been in the Queens

1  private correctional facility for the last 22 and a half
2  months, and it's very limited programs in what you can do
3  over there.  In fact, given my inquiry there is very
4  little one can do over there, but he's trying to make the
5  best of it.  He's taken several courses.  He has several
6  certificates.  I believe they are exhibits 103 through 107
7  that indicate he's taken five or six different courses and
8  has completed those sources.
9              I have had inmates who are housed there tell me
10 when I talk to them how Farrukh has helped them in the
11 jail by talking to them, counseling them and things of
12 that nature.  While he's limited in what he could do over
13 there, he's trying to do something positive.  I think he
14 would be a perfect candidate for the RDAP program.
15 Obviously that's not a program you can do pretrial, but I
16 think he would be a perfect candidate for that as well.
17             Second to last, Judge, I'm going to use the word
18 cooperation, though not in the term that we are used to
19 it.  There is no 5K, no cooperation agreement here and
20 there is no 5K letter and we are not making an issue out
21 of that.  But he did proffer with the government six
22 times.
23             His first proffer happened on July 8th of 2013,
24 which is 20 or 22 days after his arrest.  He was the
25 instrumental party at the end of the day in getting

1  everybody else to plead guilty, that's been taken into
2  consideration with a couple of global points. We
3  appreciate the government giving us those.
4        But he went in on six different occasions,
5  provided stacks of documents and while it did not lead to
6  any arrests, I think it was an assist to the government at
7  the time. The agreement he entered into, Judge, requires
8  him to pay a large amount of forfeiture and restitution.
9  He agreed to pay the penalty and interest, something that
10 could have been ordered anyway, but we somewhat took it
11 out of play for the court to make that decision and we
12 agreed to pay the penalty and interest, and, as I said, he
13 broke the logjam in saving the court and the government a
14 lengthy trial here.
15       Lastly, Judge, I want to talk about the family
16 and the family impact. Paragraph 125 of the PSR does
17 acknowledge that there is a family dynamic here. There
18 are issues with child care. We are considerably grateful
19 that Farrukh's wife did receive time served, but the
20 family here has had a tremendous impact. You can see the
21 letters from the son. You can see the letter from the
22 daughter and Mr. Baig's sister who took the kids in when
23 they were both in custody. His son has had an enormously
24 difficult time undergoing some counseling, still in a
25 state of depression over not having his father home. So

1  the family has suffered tremendously.

2  One of the things I want to highlight, Judge, is
3  Mr. Baig's letter to the court which I think comes across
4  as truthful and honest, a tremendous amount of remorse for
5  his actions.  He states pretty harshly in there that he
6  failed as a father, he failed as a husband, he failed as a
7  community leader.  He understands his actions, the
8  seriousness of his actions.  He takes full responsibility
9  for those actions, and vows never to repeat them.

10  We fully understand, Judge, that part of the
11  equation for the court to go through is punishment, and
12  that's a big part.  You have to weigh society's interests,
13  deterrence, punishment, we understand that.  My question,
14  though, is, Judge, how much punishment and in what form?
15  And in this particular case he and his wife were in prison
16  together for four months and the children were alone, they
17  had to live with relatives and go through counseling.  His
18  son is still undergoing counseling and still suffers from
19  depression.

20  The publicity in this case, Judge, was enormous,
21  one of the most publicized cases I have ever seen.  There
22  was no hiding from the shame in his community, and things
23  of that nature.  It was enormous.  He's basically lost
24  everything, and I use the term economic devastation,
25  Judge, because his house is in foreclosure and that's

1    going to be lost, he lost every store he had, forfeiture
2    of almost $5 million, restitution of $2 million, that's
3    going to follow him for the rest of his life.
4            He's 59 years old.  He has some health issues.
5    He's now a felon.  He has no job, no franchises to go back
6    to.  He's already served 22 and a half months.  He's tried
7    to do what he could while in custody, and it's only
8    through the efforts of the community who stands behind me
9    that the family has survived.
10           So my question is how much punishment is needed
11   and is the punishment that he already received enough?  I
12   submit to you, your Honor, he's not a danger to the
13   community.  I think he's actually better off serving the
14   community in some capacity, whether it be on home arrest
15   and doing hundreds and hundreds of hours of community
16   service, which is what he's done in the past.  I think
17   that would be -- suit the community better than putting
18   him behind bars.  I think there is little if any chance of
19   recidivism here.
20           Therefore, Judge, respectfully given his health,
21   his family situation, his economic situation and all the
22   good deeds that are memorialized in the letters you have
23   that he's done over his lifetime we are respectfully
24   asking for a second chance here, that he's been punished
25   enough and he'd be better off serving the community in

1 some capacity than being locked up again.

2 Thank you, your Honor.

3 THE COURT: Does your client wish to say
4 anything prior to the imposition of sentence?

5 MR. CONWAY: He does, Judge.

6 THE DEFENDANT: Good morning.

7 Your Honor, thank you for giving me an
8 opportunity to speak. I wrote you a letter as well. I'm
9 here to take full responsibility for my conduct. I feel
10 deeply remorseful for the victims and my actions. I never
11 knew my mistake would have such a great financial and
12 emotional impact on me and on my family.

13 I have embarrassed my family and disappointed my
14 friends and community. Your Honor, I apologize to you, to
15 this court, my family, friends and community.

16 THE COURT: Why don't you turn around and tell
17 them that.

18 THE DEFENDANT: I apologize to everybody here,
19 and please forgive me for my wrongdoing, what I did, I can
20 promise to you and to the judge, you will never see me in
21 this court again.

22 THE COURT: Go on.

23 THE DEFENDANT: I have been incarcerated more
24 than 22 months and this is affecting me, my wife, my
25 daughter and my son.

1      I want to go back to my family to be a husband
2  to my wife and a father to my children.  I sincerely
3  appreciate my friends and my community who have been there
4  morally, financially, to support me and my family.
5      Your Honor, I can assure you the mistake I made
6  will never be happening again.  This aberration does not
7  represent the characteristics of who I am.  Whenever I am
8  released, I will resume my charitable and humanitarian
9  work to once again become a contributing and upstanding
10 citizen of society.  Please take into consideration all my
11 good deeds before you make your final decision.
12     Last but not least, I'm thankful to my attorney,
13 Mr. Conway, who diligently represented me.  Your Honor,
14 thank you for your time.
15     THE COURT:  First let me say, I don't think what
16 you did was a mistake.
17     I think that's a misnomer.  It was criminal.
18 They were crimes, not mistakes.
19     THE DEFENDANT:  I apologize.
20     THE COURT:  In addition, based upon what
21 Mr. Conway placed on the record, crimes always affect
22 families, and criminals' activities which of a criminal
23 nature always have and it's usually a devastating effect
24 upon the families of the people who commit the crimes.
25     As far as any medical issues, they can be

1  adequately addressed by the jail.
2          Of course I must take into account all of the
3  3553 factors and taking them into account, particularly
4  your client's managerial role in the operation of these
5  criminal activities in many stores, over a long period of
6  time, and the nature and circumstances of the offenses he
7  committed, those offenses are very, very serious, and
8  although you call it a rags to riches story, the fact of
9  the matter is that those riches, the success was earned,
10 in large part, on the backs of the victimized workers.
11         As far as the need for just punishment, his
12 crimes, as noted in the government's letter, had the
13 capacity and did cause severe social and financial harm to
14 the victims, as well as diminishing the American right to
15 a fair day's pay for a fair day's work.  So there is
16 certainly need for ample punishment here.
17         As far as general deterrence, the fact that
18 people continue to gain financial reward from abuse of the
19 immigration laws has to be addressed as far as general
20 deterrence, and as far as specific deterrence, these
21 crimes went on for a long, long period of time, so while
22 it's clear that he succeeded, as I mentioned before, that
23 success probably would not have been achieved without all
24 of these crimes and frauds which he perpetrated.
25         A sentence must also promote respect for the law

1  and that is a major concern of the court as well.  I
2  understand that he will be making restitution.  I
3  understand that he has done good things, but it cannot
4  take away the crimes which were committed here.
5           And the sentence will be as follows, 87 months
6  of incarceration, with three years of supervised release
7  on count one.
8           On count two, 87 months of incarceration
9  concurrent with that in count one, an order of restitution
10 in the amount of $2,621,114.97 due immediately, with
11 $25,000 payable within 60 days after sentencing.
12 Therefore, payable at a rate of $25 per quarter while in
13 custody and 10 percent of the gross income of the
14 defendant while on supervised release.
15          Three years of supervised release with the
16 following special conditions, compliance with the
17 restitution order and forfeiture agreement, full financial
18 disclosure to the probation department.
19          You shall not possess a firearm, ammunition or
20 any type of destructive device.  There is a search
21 condition and a $200 special assessment, which means that
22 any property or anything within your control may, upon
23 reasonable notice and at reasonable times, be searched by
24 probation department upon the basis that there is
25 reasonable cause to believe that you may have contraband.

1     That concludes the sentence of the court, and,
2  Mr. Conway, please advise your client of his rights of
3  appeal and I'm signing the preliminary order of
4  forfeiture.
5     MR. CONWAY:  Your Honor, I have two requests,
6  and I'm not sure about the court's procedure, but I would
7  ask that you recommend -- I'm not sure if you do that, but
8  I'll ask for a recommendation of Fort Dix, New Jersey, so
9  it's close proximity for family visits.
10     THE COURT:  I never make such a recommendation.
11     MR. CONWAY:  And the other request that I would
12  have your Honor I think as it says in the probation
13  report, I believe in paragraph 95, I would ask if you make
14  a recommendation that he be placed in the RDAP program.
15     THE COURT:  I never make such recommendations.
16     That is also up to the Bureau of Prisons.
17     MR. OTT:  Thank you, your Honor.
18     MR. BURNS:  Thank you, your Honor.
19     MR. CONWAY:  Thank you, your Honor.
20     (The matter concluded.)